## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ALAN SCOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 09-2372 (RCL)** |
| | ) | |
| **JOYCE K. CONLEY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court is plaintiff Alan Scott's Motion [77] for Reconsideration, the defendants' Opposition [83] thereto, and Scott's Reply [89].    Additionally, the Court now considers defendants' third Motion [83] to Dismiss, Scott's Opposition [89] thereto, and the defendants' Reply [92].  Although the Court grants Scott's motion for reconsideration as to his *Bivens* claims, the Court nevertheless dismisses the *Bivens* claims because of a lack of personal jurisdiction over certain defendants, a failure to identify the John Doe defendants, and because the remaining defendants enjoy qualified immunity.  The Court also dismisses Scott's Privacy Act claims for failure to state a claim.

## I.    BACKGROUND

Alan Scott is a former federal prisoner with a string of convictions for fraudulent activity. His "approximately 23 convictions," include fraud, identity theft offenses, conspiracy to commit mail fraud, and making false statements to banks.  Defs.' Reply to Pl.'s Opp'n to Defs.' Second Motion to Dismiss [hereinafter Defs.' Second Reply], Ex. A (Decl. of Leslie Smith) ¶ 9 [hereinafter Smith I Decl.], ECF No. 74-1.  Most recently, while incarcerated for other crimes,

Scott engaged in a scheme to defraud class action claims administrators and members of class action settlements by filing false claims in class action settlements of securities fraud cases.  *Id.* In May 2008, he pleaded guilty to Conspiracy to Commit Mail Fraud in violation of 18 U.S.C. §§ 1341 and 1349 and was sentenced to an additional 32 months in prison.  *Id.*

After this conviction, Scott was transferred to a Communications Management Unit ("CMU") at FCI Terre Haute.  According to Scott, the "CMU" is under the control of the Correctional Programs Division and the Counter Terrorism Unit ("CTU") of the Federal Bureau of Prisons ("BOP") and houses inmates in restrictive conditions that allow increased monitoring of their communications.  Compl. ¶ 6; Smith Decl. ¶ 5.  Scott was placed there when BOP determined that his offense conduct and other "misuse/abuse of legal mail," required "heightened controls and review" of his "contact with persons in the community."  Smith Decl. ¶ 10.

Scott subsequently brought this action against assorted BOP officials in their individual capacities under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and against BOP under the Privacy Act, *see* 5 U.S.C. § 552a.  *See* Compl., ECF No. 1; Am. Compl., ECF No. 6; Second Am. Compl., ECF No. 55.

Scott alleges that BOP officials, including staff of the Washington, D.C.-based CTU and the wardens of individual prisons, violated his First and Fifth Amendment rights by blocking certain incoming and outgoing correspondence while he was in custody.  For these injuries, Scott sought declaratory and injunctive relief, and compensatory and punitive damages.  Compl. ¶ 32. He further alleged that BOP violated the Privacy Act, 5 U.S.C. § 552a, by maintaining a system of records in violation of the Act, disclosing information to third parties without his consent, and refusing to disclose to him information collected about him.  Compl. ¶¶ 27–31; Am. Compl. ¶ 28(A).  Defendants have twice previously moved to dismiss the case.  *See* Defs.' Mot. to

Dismiss, ECF No. 20 [hereinafter Defs.' First MTD] (denied as moot when Court granted Scott's

Mot. for Leave to Amend Compl., ECF No. 34); Defs.' Second Mot. to Dismiss, ECF No. 59

[hereinafter Defs.' Second MTD].   In September 2012, this Court granted in part the Second

Motion to Dismiss, dismissing Scott's *Bivens* claims as moot after his December 2010 release

from custody but finding that the Court lacked sufficient information to resolve the Privacy Act

claims.  *Scott v. Conley*, 2012 WL 4433473, at *3, 4.  Scott now moves for reconsideration of the

Court's September 2012 holding that his *Bivens* claims are moot.  Pl.'s Mot. Recons., ECF No.

77.  BOP opposes this motion and renews its motion to dismiss the case.  *See* Defs.' Third Mot.

to Dismiss and Opp'n to Pl.'s Mot. Recons., ECF No. 83 [hereinafter Defs.' Third MTD].

## II.   DEFENDANT SCOTT'S MOTION FOR RECONSIDERATION REGARDING *BIVENS* CLAIMS

In its September 2012 Memorandum Opinion, the Court noted that Scott had conceded

his *Bivens* claims were moot in light of his release.  *Scott v. Conley*, 2012 WL 4433473, at *3.

Scott now argues that he previously conceded *only* that his request for injunctive relief was moot

and that his remaining request for monetary damages prevents a finding of mootness of the

claims.   Pl.'s Mot. Recons., *see also* Pl.'s Opp'n to Defs.' Second MTD 2, ECF No. 62

[hereinafter Pl.'s Second Opp'n].  The Court agrees.

A court may revise its interlocutory decisions "at any time before the entry of judgment

adjudicating all the claims and the rights and liabilities of all the parties."  Fed. R. Civ. P. 54(b).

Rule 54(b) provides a procedural mechanism for reconsideration, but sets forth little guidance as

to when such review is appropriate.  To fill this gap, other members of this Court have held that

such reconsideration is appropriate "'as justice requires.'"  *Hoffman v. Dist. of Columbia,* 681 F.

Supp. 2d 86, 90 (D.D.C. 2010) (citation omitted).

Circumstances that may warrant reconsideration under this standard include "whether the court 'has patently misunderstood a party, has made a decision outside the adversarial issues presented to the court by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court.'" *Ficken v. Golden,* 696 F. Supp. 2d 21, 35 (D.D.C. 2010) (quoting *Cobell v. Norton,* 224 F.R.D. 266, 272 (D.D.C. 2004)).  Errors of apprehension may include a Court's failure to consider "controlling decisions or data that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995).

The "as justice requires" standard gives the trial court great discretion. *Judicial Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 123 (D.D.C. 2006).  Additionally, "[i]nterlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment." *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997).

The Court agrees that it misunderstood Scott's previous concession—he conceded only that his claims were injunctive relief based on alleged Constitutional violations were moot. Moreover, Scott's claim for monetary damages is not moot post-incarceration.  Thus, the Court will grant his motion for reconsideration and revive his *Bivens* claims.  Nevertheless the Court finds the claims must be dismissed on other grounds.

## III.   RECONSIDERATION OF *BIVENS* CLAIMS

### A.   Sovereign Immunity Does Not Bar Consideration

BOP argues that, if Scott's *Bivens* claims are construed as "against the BOP and the individually-named defendants in their official capacities, sovereign immunity bars such claims and dismissal is proper under Fed. R. Civ. P. 12(b)(1)." Defs.' Mem. P. & A. in Support of their Mot. to Dismiss Pl.'s Compl. and Am. Compls. 17, ECF No. 16 [hereinafter Defs.' Second

4

Mem.].   Sovereign immunity is a jurisdictional issue.   Because a lack of jurisdiction would require the Court to dismiss the claims, the Court must first consider this question.   *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."   *United States v. Mitchell*, 463 U.S. 206, 212 (1983).   However, sovereign immunity does not bar *Bivens* claims against federal officials in their *individual* capacities.   *Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) ("*Bivens* actions are for damages. They cannot be viewed as actions against the government. Unlike official-capacity suits, the sovereign's immunity from damages is therefore not a defense.").   Moreover, "[i]t is well established that *Bivens* remedies do not exist against officials sued *in their official capacities*," *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011) (emphasis added), or against the employing agency or the United States, *Corr. Services Corp. v. Malesko*, 534 U.S. 61, 72 (2001).

The Court does not read Scott's *Bivens* claims as against the BOP or against the named defendants in their official capacities.   Rather, he sues the named individual defendants in their individual capacities, subject to the defense of qualified immunity. *See Malesko*, 534 U.S. at 72. Any request for injunctive relief against the individuals in their official capacities remains moot. Thus, the Court has jurisdiction over Scott's *Bivens* money damages claims.

**B.     Scott's *Bivens* Claim Fails for Other Reasons**

As an initial matter, it is not clear that a *Bivens* remedy is available to Scott.   The Supreme Court has shown considerable reluctance to expand *Bivens*, particularly where administrative remedies are available to complainants.   *See Malesko*, 534 U.S. at 66–74 (noting Court's "consistent[] refus[al] to extend *Bivens* liability" and declining to extend it to actions for damages against private prison officials in part because inmates in private facilities have "full

access to [BOP] remedial mechanisms").  The Court will assume for the purposes of this motion

that a *Bivens* remedy is available, but nevertheless finds that Scott's claim fails for other reasons.

### 1.  *Court Lacks Personal Jurisdiction Over Defendants Schultz, Jett, Lockett, and Cozza-Rhodes*

At the time of filing, defendant Schultz was the warden of FCI Fairton in New Jersey, Jett

was the former warden of FCI Terre Haute in Indiana, Lockett was the current warden at FCI

Terre Haute, and Cozza-Rhodes was the current Associate Warden at FCI Terre Haute.

Defendants Lockett, Jett, and Cozza-Rhodes waived service of process, *see* ECF No. 15–17, and

Schultz was served by certified mail, *see* ECF No. 7.  Scott has not alleged that any of these

defendants were domiciled in, or had their principal place of business in the District of

Columbia, as required under the District's general personal jurisdiction statute.  *See* D.C. Code §

13-422.   Thus, this Court has jurisdiction over the defendants only if specific personal

jurisdiction exists under the District's long-arm statute, taking into account relevant

constitutional limits.  *Reuber v. United States*, 750 F.2d 1039, 1049 (D.C. Cir. 1984)

While "strictly speaking, under Federal Rule 8(a) plaintiffs are not required to plead the

basis for personal jurisdiction over defendants," 4 Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1067.6 (3d ed.), "plaintiffs retain the burden of proving

personal jurisdiction, [and] can satisfy that burden with a *prima facie* showing unless the trial

court holds an evidentiary hearing."  *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415,

424 (D.C. Cir. 1991) (citation omitted).  "If [a plaintiff's] allegations of jurisdictional facts are

challenged by his adversary in any appropriate manner, he must support them by competent

proof.  And where they are not so challenged the court may still insist that the jurisdictional facts

be established or the case be dismissed, and for that purpose the court may demand that the party

alleging jurisdiction justify his allegations by a preponderance of evidence." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *see also Reuber*, 750 F.2d at 1052.

The District's long-arm statute, D.C. Code § 13-423, provides for personal jurisdiction where a claim arises from a person having, among other things: transacted business in the District of Columbia; contracted to supply services in the District; caused tortious injury in the District by "an act or omission outside of the District if he regularly does or solicits business [or] engages in any other persistent course of conduct . . . in the District"; or where "there is any basis consistent with the United States Constitution for the exercise of personal jurisdiction." When personal jurisdiction is "based solely upon" § 13-423, "only a claim for relief arising from acts enumerated in this section may be asserted against" the person. *Id.* § 13-423(b).

The Constitution also limits a court's exercise of personal jurisdiction over an individual. "A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787 (2011) (internal quotation marks omitted) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "As a general rule, the sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws . . . .'" *Id.*

Here, plaintiff has not alleged facts from which the Court could conclude that personal jurisdiction exists over these defendants. "Plaintiff must allege specific facts on which personal jurisdiction can be based; [he] cannot rely on conclusory allegations." *Walton v. Fed. Bureau of Prisons*, 533 F. Supp. 2d 107, 112 (D.D.C. 2008) (internal citation and quotation marks omitted). Scott has not alleged that Schultz, Jett, Lockett, or Cozza-Rhodes meet any of the enumerated

requirements of the D.C. long-arm statute such as transacting business or supplying services in the District.  Moreover, he has not suggested that these defendants committed tortious injury and regularly do or solicit business here.  Furthermore, it is of no moment that defendants are employees of a federal agency headquartered in the District.  *Scinto v. Fed. Bureau of Prisons*, 608 F. Supp. 2d 4, 7–8 (D.D.C. 2009) *aff'd*, 352 F. App'x 448 (D.C. Cir. 2009) ("'[T]he mere fact that [a non-resident defendant] is an employee of the BOP, the headquarters office of which is in the District, does not render [the defendant] subject to suit in [his or her] individual capacity in the District of Columbia.'" (internal citations omitted)).

Moreover, Scott has not alleged facts from which the Court could find a Constitutional basis for exercising personal jurisdiction.  Scott has not contended there are *any* contacts by the defendants with the District of Columbia, much less contacts rising to the level necessary to meet the "minimum contacts" requirement of *International Shoe*.  Although Scott's opposition to the motion to dismiss states that three other defendants "all maintain their offices within the District and all of their activities with respect to plaintiff's allegations of constitutional misconduct took place within the District of Columbia," Scott never alleges that Schultz, Jett, Lockett, or Cozza-Rhodes have similar minimum contacts with the District.  *See* Pl.'s Second Opp'n 3.  That Lockett, Jett, and Cozza-Rhodes waived service of process does not alter this conclusion.  *See* Fed. R. Civ. P. 4(d)(1), (5) (stating that individuals have a duty to avoid the unnecessary expenses of service and that "[w]aiving service of a summons does not waive any objection to personal jurisdiction . . . .").

Finally, Scott has not suggested or shown that he can cure these defects through discovery and he has already had the opportunity to propound interrogatories.  *See GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) ("[I]f a party

demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified.").

Thus, Scott has not shown that the Court has personal jurisdiction over Schultz, Jett, Lockett, or Cozza-Rhodes and claims against these defendants are dismissed without prejudice.

### 2. *Personal Jurisdiction Over Conley and Smith and Lack of Adequate Service*

BOP has previously argued that the Court lacks jurisdiction over "all Defendants," including Conley and Smith. Defs.' Second Mem. 59. However, BOP does not address Scott's argument that jurisdiction over Conley and Smith lies because they work in the District and because any actions by them in violation of his constitutional rights took places in the District. The D.C. Circuit has previously suggested that courts in the District would have *general* personal jurisdiction over BOP officials working in the District. *See Cameron v. Thornburgh*, 983 F.2d 253, 258 n.4 (D.C. Cir. 1993) ("[W]e conclude that D.C. Code Annotated § 13-422, which provides for general personal jurisdiction over any person who 'maintain[s] his or its principal place of business' in the District, does give this court personal jurisdiction over [the then-Director of BOP], whose office was located in the District.").[1] Thus, the Court cannot conclude at this time that it lacks personal jurisdiction over Conley and Smith.

Alternatively, the government argues that the claims against these defendants should be dismissed for lack of proper service. When suing an officer in his individual capacity, a party

---

[1] District courts in our Circuit also appear to have contemplated that general jurisdiction would exist over defendants who work in the District. *See Lineberry v. Fed. Bureau of Prisons*, No. 11-2056, 2013 WL 563526, at *2 (D.D.C. Feb. 15, 2013) ("[Defendant] does 'not work or reside in the District of Columbia,' . . . [defendant], then, is not "a person . . . maintaining [a] principal place of business in, the District . . . over whom this Court may exercise jurisdiction." (citing D.C. Code § 13–422)); *Scinto v. Fed. Bureau of Prisons*, 608 F. Supp. 2d 4, 6–7 (D.D.C. 2009) (analyzing personal jurisdiction under long-arm, instead of general, jurisdiction statute where defendants were not alleged to have been "employed in" or to have resided in the District); *Mullen v. Bureau of Prisons*, 843 F. Supp. 2d 112, 116 (D.D.C. 2012) ("[T]his court lacks personal jurisdiction over [defendants], who are not listed in the complaint as either residing or working in the District of Columbia or alleged to have sufficient contacts here to confer jurisdiction under the District's long-arm statute." (emphasis added)).

must "serve the officer or employee under Rule 4(e)" in addition to serving the United States. Fed. R. Civ. P. 4(i)(3); *see also Simpkins,* 108 F.3d at 369 (applying this requirement to *Bivens* claim); *United States v. Hill,* 694 F.2d 258, 261 (D.C. Cir. 1982) ("Personal jurisdiction in a civil suit implies . . . either voluntary appearance by the defendant or valid service of process on him at the place where he may be found.")[2]

Under Rule 4(e), personal service may be accomplished "by delivering a copy of the summons and of the complaint to the individual personally," "leaving a copy of each at the individual's dwelling or usual place of abode . . . ," or "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." *Id.* 4(e)(2). Alternatively, service may be effected pursuant to the law of the state in which the district court sits or where service is made, which for Conley and Smith would be the law of the District of Columbia. *Id.* 4(e)(1), *see* Super. Ct. Civ. R. 4(e)(2) (allowing service of process on individual plaintiffs by first class, certified, or registered mail). Additionally, service must be effected within 120 days after the complaint is filed or the court "must dismiss the action without prejudice against that defendant or order that service be made . . . ." Rule 4(m). However, if a plaintiff shows "good cause for the failure, the court must extend the time for service for an appropriate period." *Id.*

Service on Smith and Conley was ineffective in that they were not personally served. Rather, service was addressed to them in their "Individual Capacit[ies]" at the Correctional Programs Division office of the BOP in Washington, D.C. and an "Assistant General Counsel" signed for each. Scott complains that "[a]ny defect . . . is lodged with the Clerk's Office and the

---

[2] It does not appear that defendants have voluntarily appeared and thus waived the defense of lack of personal jurisdiction or insufficient service. *See* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1344 (3d ed.) ("If the defendant appears in the action, he must interpose any of these objections he may have by motion or in the answer or they will be deemed waived by virtue of Rule 12(h)(1)."). Defendants have consistently raised lack of personal jurisdiction and the absence of proper service as a defense to Scott's claims.

U.S. Marshals Service," on whom he depended on for service as an *in forma pauperis* plaintiff. Pl.'s Second Opp'n 3 (citing 28 U.S.C. § 1915(d)).

Scott appears to have the better argument on this point. Courts in our Circuit and others have refused to hold *in forma pauperis* plaintiffs responsible for service defects where they have relied on the Clerk of Court and the Marshals Service.[3]

Nevertheless, these defendants have qualified immunity, as discussed below.

### 3.   *Court Will Dismiss Claims Against "John Doe" Defendants*

The Court will no longer consider Scott's claims against unnamed John Doe defendants.

As a general matter, a court will not entertain a suit unless the defendant has been made a party by service of process. Courts do grant an exception . . . for "John Doe" defendants, but only in situations where the otherwise unavailable identity of the defendant will eventually be made known through discovery.

*Newdow v. Roberts*, 603 F.3d 1002, 1010–11 (D.C. Cir. 2010) (citations omitted). "In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).

Scott has had an opportunity for discovery. *See* Order, Mar. 8, 2011, ECF No. 45 (granting motion to compel answers to interrogatories). Indeed, Scott previously attempted to

---

[3] *See Dumaguin v. Sec'y of Health & Human Services*, 28 F.3d 1218, 1221 (D.C. Cir. 1994) (where plaintiff "repeatedly requested the Unites States Marshal to serve the United States" and "he failed to do so," "good cause existed under [former] Federal Rule of Civil Procedure 4(j) to excuse her failure to personally serve the United States Attorney"); *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1060 (D.C. Cir. 1988) (MacKinnon, J. concurring) ("[T]he Marshal waited until after the statutory time period to serve the United States Attorney. Under such circumstances the delay was tolled . . . ."); *Puett v. Blanford*, 912 F.2d 270, 275 (9th Cir. 1990) ("[H]aving provided the necessary information to help effectuate service, plaintiff should not be penalized by having his or her action dismissed for failure to effect service where the U.S. Marshal or the court has failed to perform the duties required of each of them . . . ."); *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990) (Marshal's failure to effect service of process for *in forma pauperis* plaintiff is "automatically good cause" within [the Federal Rules]); *but see Johnson v. Williams*, No. 05-2315, 2006 WL 2788985 (D.D.C. Sept. 26, 2006) ("Deference to plaintiffs' *pro se* status . . . cannot justify the exercise of jurisdiction over defendants who have not been served properly.").

substitute BOP employee David Schiavone in place of John Doe #1 based on interrogatory answers.  Pl.'s Mot. to Substitute, ECF No. 67.  The Court denied this motion as moot based on its ruling that the *Bivens* claims themselves were moot.  *See* Order, Sept. 27, 2012, ECF No. 75.

Despite having received answers to interrogatories, Scott has never identified the remaining two defendants.  He attributes this to the "failure of defendant Smith to properly respond fully and truthfully to the Interrogatories propounded upon him" and stated in his November 10, 2011 Opposition that "those discovery issues will be addressed in a separate motion yet to be filed."  Pl.'s Second Opp'n 4.  However, Scott has never filed such a motion.

Although it would likely be error for this Court to dismiss claims against John Doe defendants without giving Scott a chance for discovery, this is not the situation at hand.  *Cf. Gillespie*, 629 F.2d at 642–43 (holding that district court abused its discretion in dismissing complaint without requiring a reply to interrogatories appellant had filed).  Moreover, although the Court has revived Scott's *Bivens* claims thus raising the possibility that Schiavone could be named as a defendant, Scott would need to renew his motion to substitute.  Such a motion would fail given that the Court finds that the remaining defendants have qualified immunity from suit and Schiavone would enjoy immunity for the same reasons.

### 4.    *Remaining Defendants Are Shielded by Qualified Immunity*

Defendants argue that the named individual defendants have qualified immunity from suit.  Smith and Conley are the only defendants remaining after the Court's dismissal of the claims above and the Court agrees they are immune from suit.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Such "qualified" or "good faith" immunity is an affirmative defense

that must be pleaded by the defendant. *Id.* at 815. The doctrine represents an attempt to balance the competing values of ensuring a remedy for constitutional violations committed by government officials and reducing the social costs of suits against innocent government actors. The Supreme Court has emphasized that the doctrine furthers the Court's admonition that "insubstantial claims should not proceed to trial." *Id.* at 815–16. "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

At the time of the alleged violations, defendants Conley and Smith were higher-level officials within BOP. Conley was the Assistant Director of the BOP's Correctional Programs Division and Smith was the Chief of the Counter Terrorism Unit.[4] Compl. ¶ 2. Scott alleges that Smith live monitored his calls, determined whether his social mail should be approved or rejected, and determined whether his visitors would be approved. Compl. ¶¶ 7. In an amended complaint, he argues that Conley also acted to reject certain correspondence and access to books. Am. Compl. ¶¶ 17(A)–(B) ("[D]efendants Jett, Lockett[, and] Cozza-Rhodes acting in concert and conspiracy with defendants Conley, Smith and John Doe's #1, 2, [and] 3 committed . . . overt acts" including rejecting incoming mail and photographs, blocking outgoing mail, etc.) These are the sorts of discretionary functions for which qualified immunity is available. *See Harlow*, 457 U.S. at 816 ("In contrast with the thought processes accompanying 'ministerial' tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions.").

Qualified immunity will shield these defendants from money damages "unless [Scott] pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that

---

[4] The John Doe defendants were identified as "Intelligence Analysts or Technicians" within CTU. Compl. ¶ 2.

the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 131 S. Ct. at 2080.  This Court has discretion as to which prong of this analysis to consider first and will consider the second prong now.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

An official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Id.* at 2083 (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  Courts need not identify "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* Here, Scott has not put forth facts to show that the alleged conduct violates "clearly established law" under either a First or Fifth Amendment theory.[5]

### a.  No "clearly established" First Amendment right

Scott's First Amendment claims sound in freedom of speech and association.  Compl. ¶¶ 16–26 (complaining of restrictions on communication with financial institutions, receipt of certain books and receipts, correspondence with particular addresses, and receipt of photographs); *see id.* ¶¶ 15–16, 19 (appearing to concede that BOP may lawfully restrict certain inmate-to-inmate mail but complaining that defendants improperly categorized certain correspondence as inmate-to-inmate).  However, no "clearly established law" protects Scott from the conduct complained of.  In fact, a significant body of caselaw suggests that the defendants' actions were lawful, though the Court need not decide the legality of the actions in order to determine that they did not violate "clearly established" law.

---

[5] Defendants argue that a number of the incidents upon which Scott basis his *Bivens* claim were not administratively exhausted, as required under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997 et seq.  *See* Defs.' Second Mem. 25 (arguing that Scott had not exhausted claims regarding the loss of books in the mail, the rejection of two books, the delay in sending outgoing email to his aunt instructing her to make a payment to a credit card, and rejection of correspondence from Catherine Tatum).  However, even assuming defendants are correct, other claims remain that could support a First Amendment challenge.  Thus, the Court will evaluate whether defendants have qualified immunity based on the facts alleged.

"Prison walls do not . . . separat[e] prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).  However, in considering prisoners' constitutional claims, courts should bear in mind that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform" and that "the problems of prisons in America are complex . . . and not readily susceptible of resolution by decree."  *Procunier*, 416 U.S. at 404–05.  "Prison administration is, moreover, a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint." *Turner*, 482 U.S. at 84–85.

The Supreme Court has noted that "freedom of association is among the rights least compatible with incarceration . . ." and that "[s]ome curtailment of that freedom must be expected in the prison context."  *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125–26 (1977); *Hewitt v. Helms*, 459 U.S. 460 (1983)).  In *Jones*, the Court stated

> First Amendment associational rights . . . must give way to the reasonable considerations of penal management. . . .  [N]umerous associational rights are necessarily curtailed by the realities of confinement.  They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations . . . possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment.

433 U.S. at 132.

Freedom of speech may also be lawfully restricted to some degree in the prison setting. The Supreme Court has held, for example, that a prison policy denying "'newspapers, magazines, and photographs' to a group of specially dangerous and recalcitrant inmates" survived First Amendment scrutiny where prison officials sufficiently justified the need for the policy under the *Turner* test outlined below.  *Beard v. Banks*, 548 U.S. 521, 524–25 (2006); *see*

*also Thornburgh v. Abbott,* 490 U.S. 401 (1989) (holding that regulations "authoriz[ing] prison officials to reject incoming publications found to be detrimental to institutional security" satisfied *Turner* test and were facially valid).

The Supreme Court in *Turner v. Safley* held that four factors are relevant to whether a prison regulation infringing on a constitutional right withstands challenge:

> [1] whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; [2] whether alternative means are open to inmates to exercise the asserted right; [3] what impact an accommodation of the right would have on guards and inmates and prison resources; and [4] whether there are 'ready alternatives' to the regulation.

*Overton*, 539 U.S. at 132 (quoting *Turner*, 482 U.S. at 89–91)).  This inquiry is intended to be "responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'"  *Turner*, 482 U.S. at 85.

Defendants assert that the monitoring of and restrictions on Scott's mail were intended to advance a legitimate penological interest in prevention of criminal activity and maintenance of the security of the prison.  Defs.' Second Mem. 33–34.  Scott had numerous previous convictions for fraudulent activity and had been convicted of conspiracy to commit mail fraud based on his conduct *while in prison*.  Defendants assert that Scott also mailed one letter making a threatening remark against a BOP staff member, *id.*, though Scott responds that he was found not guilty of this charge.  Pl.'s Second Opp'n 2.  Additionally, certain of Scott's correspondence were rejected because defendants believed they constituted an attempt to evade BOP restrictions on inmate-to-inmate letters forwarded through third parties.  *See* Compl. ¶ 16; Defs.' Second Mem. 34.

Targeted restrictions on incoming and outgoing mail clearly bear a "valid, rational connection" to the legitimate government interest of preventing criminal activity and discipline and compliance with existing BOP regulations.  *See Thornburgh*, 490 U.S. at 404 (upholding regulation on incoming mail allowing warden to reject a publication "only if it is determined

detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity"). Scott had previous convictions for mail and bank fraud offenses and it was not unreasonable for defendants to impose restrictions on his use of the mail to prevent continuing criminal activity in this area.[6]

Moreover, the policy, as alleged by Scott, was applied on a case-by-case basis. The Supreme Court has previously upheld such tailored limitations. *Id.* at 416 ("[W]e are comforted by the individualized nature of the determinations required by the regulation.").

Furthermore, the particular restrictions do not appear to have been indefinite; Scott concedes that in at least one instance BOP removed a previously imposed restriction on certain mail activities after finding it to be no longer justified. *See* Pl.'s Second Opp'n 7–8 (noting that defendant Lockett unblocked correspondence to and from Scott's alleged home address following further review and a determination that Scott had not used that address to communicate with other inmates).

Finally, although Scott argues that the reasons given for blocking certain mail were pretextual, Compl. ¶ 17, 19, he provides no factual basis for this claim. He also does not argue that defendants acted in a discriminatory or otherwise unconstitutional manner. [7]

---

[6] For example, Scott alleges that defendants Conley, Smith, the John Doe's and others rejected one book entitled "Hacking Exposed Computer Forensics: Secrets & Solutions." Compl. ¶¶ 17–18. It is hardly surprising that BOP might consider such a book to be a security risk in a prison that allows its inmates access to email and computers.

[7] Indeed in the context of other restrictions on First Amendment activities in the CMUs, Judge Urbina of this court has noted:

> [T]he weight of the relevant case law supports the conclusion that the types of communications restrictions imposed by the CMUs are rationally related to the legitimate penological interest of promoting the safety of correctional institutions and the public.

*Aref v. Holder*, 774 F. Supp. 2d 147, 163 (2011). Judge Urbina cited a range of cases supporting this contention. *See, e.g.*, *Williams v. Mierzejewski*, 401 Fed. App'x 142, 145 (7th Cir. 2010) ("We give considerable deference to a prison official's determination that a communication between a prisoner and the outside world constitutes a security threat." (citing *Thornburgh*, 490 U.S. at 407–08)); *Perez v. Fed. Bureau of Prisons*, 229 Fed. App'x 55, 57 (3d Cir. 2007) (holding that "restrict[ing] telephone calls to one per week [for] prisoners who have a history of using the telephone to conduct criminal activity is clearly reasonable because it relates to the legitimate penological goal of public and institutional safety"); *Pope v. Hightower*, 101 F.3d 1382, 1385 (11th Cir. 1996) (explaining that

Scott also had alternative means to exercise his rights.  He could communicate with other inmates but simply could not do so through a third party.  He could send and receive books and materials, so long as they were not apparently related to criminal activity.  "Alternatives . . . need not be ideal . . . they need only be available."  *Overton*, 539 U.S. at 135.

Accommodating Scott's First Amendment rights could have had an adverse effect on prison security and the public.  Defendants' restrictions were intended to prevent fraudulent activity against outside entities, conduct in which Scott had already engaged *while in prison*. Moreover, allowing inmate-to-inmate correspondence without regard to BOP regulations could affect internal prison security.  For example, defendants allege that at one point, Scott attempted to teach other inmates how to circumvent BOP mail procedures.  Defs.' Second Mem. 10.  The Court need not resolve whether all of defendants' allegations or suspicions about Scott are correct.  The issue is whether their conduct violated clearly established law which requires only that the restrictions have a "valid, rational connection" to a legitimate governmental interest and satisfy the *Turner* test.

Finally, the Court is not aware of "ready alternatives" to the restrictions and Scott has not put forward any.  Scott concedes that defendants individually evaluated each piece of mail and offered an administrative remedy process, which Scott in some cases employed.  The Constitution does not require that inmates have unfettered mail access, nor does it prevent BOP from exercising discretion as to what constitutes a risk to the institution or the public.

Thus, Conley and Smith enjoy qualified immunity from suit based on an alleged violation of Scott's First Amendment rights.

---

imposition of a ten-person calling list is rationally related to legitimate governmental objective of reducing criminal activity); *Searcy v. United States*, 668 F. Supp. 2d 113, 122 (D.D.C. 2009) (holding that "regulations restricting inmates' telephone use are reasonable as long as they further the government's legitimate penological interests, including the safety and security of correctional institutions, inmates, staff, and the public" (citation omitted)).

b.  No "clearly established" Due Process right

Scott has also failed to demonstrate that defendants' actions could have violated any "clearly established" due process right.  Although Scott provides no details, the Court reads his Complaint as alleging a procedural due process violation based on the deprivation of his property (books, mail, etc.) through mail restrictions.[8]

The Fifth Amendment provides that no person shall be "deprived of life, liberty or property, without due process of law."  U.S. Const. amend. V.  "The touchstone of due process is protection of the individual against arbitrary [government] action."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)).  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333 (internal quotation marks omitted).  Thus, to state a procedural due process claim, a plaintiff must show he was deprived of a life, liberty, or property interest, that government action resulted in the deprivation, and that he did not receive the process he was due.

The Court will assume for purposes of this motion that Scott has adequately alleged that he was deprived of a property interest and that government action was the cause.  *See, e.g.*, Compl. ¶ 18 (rejection of books); *id.* ¶ 20 (rejection of photographs).

As with other prisoners' rights cases, unique concerns arise in the context of prisoners' due process claims because a prisoner has already been deprived of much of his liberty through the process of conviction and incarceration.  "[T]he due process rights of prisoners are not

---

[8] Again, defendants have suggested that Scott did not exhaust his claims with respect to the rejection of two books. However, because the Court assumes that Scott may intend his procedural due process claim to encompass other actions by defendants, the Court evaluates whether defendants have qualified immunity based on the facts alleged.

absolute, but must be accommodated to the legitimate security needs of a corrections institution." *Caldwell v. Miller*, 790 F.2d 589, 609 (7th Cir. 1986) (citing *Bell v. Wolfish*, 441 U.S. 520, 554 (1979); *Wolff*, 418 U.S. at 555–57).  Thus, "to the extent that prison officials further their interest in security and order in a reasonable and non-arbitrary manner, property claims of inmates must give way." *Id.* (citing *Harris v. Forsyth*, 735 F.2d 1235 (11th Cir. 1984))

Courts have routinely refused to find unconstitutional government actions that deprive prisoners of property so long as an adequate post-deprivation remedy exists.  *See Dickson v. Mattera*, 38 F. App'x 21, 22 (D.C. Cir. 2002) (finding that appellant could not state a due process claim where his possessions were seized upon his arrest but never returned; adequate post-deprivation remedies were available); Brief of Appellant, *Dickson v. Mattera*, 38 F. App'x 21 (D.C. Cir. 2002) (No. 01-7120), 2001 WL 36038388 (describing facts of case); *see also Hudson v. Palmer,* 468 U.S. 517, 533 (1984) (holding that unauthorized intentional deprivation of prisoner's property by state penal institution officer did not violate Fourteenth Amendment Due Process Clause since respondent had adequate state post-deprivation remedies); *Parratt v. Taylor,* 451 U.S. 527, 541 (1981) (holding that negligent deprivation of state prisoner's property did not violate Due Process because, although under color of state law, the deprivation was not pursuant to established state procedures and adequate post-deprivation procedures existed), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327 (1986).

The Court acknowledges that cases like *Hudson* and *Parratt* differ somewhat from the case at hand in that they deal with either negligent, or intentional but unauthorized, deprivations of property.  Here, Scott appears to allege that the defendants acted intentionally, but *with* authorization.  Nevertheless, the Court is aware of no "clearly established" law suggesting that a post-deprivation remedy would be inadequate where the policy is intended to prevent the

introduction of harmful materials into the prison or to prevent ongoing criminal activity.  The same rationales supporting a post-deprivation remedy in *Hudson* and *Parratt* would appear to support the adequacy of a post-deprivation remedy here.

As the Court explained in *Parratt*, where a taking of property occurs as a result of a random, unauthorized act by a state employee, "[it] is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. . . .  Indeed, in most cases, it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." 451 U.S. at 541.  Similarly, in *Hudson*, the Court noted that

> [*Parratt*'s] reasoning applies as well to intentional [but unauthorized] deprivations of property. The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" . . . . We can discern no logical distinction between negligent and intentional deprivations of property insofar as the "practicability" of affording predeprivation process is concerned. . . . Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a [Due Process] violation . . . if a meaningful postdeprivation remedy for the loss is available.

468 U.S. at 533.

The Supreme Court does not appear to have considered whether a post-deprivation remedy would suffice where an authorized, intentional taking of property is effected to secure prison security and safety and to prevent criminal activity.  However, the rationales of *Parratt* and *Hudson* would seem applicable in such a case.  It would be "impracticable" to force prison officials to wait until dangerous or criminal items have been introduced into the prison or sent by inmates into the community before acting.  Providing prisoners with pre-deprivation remedies before confiscating those items could jeopardize prison safety and order as well as the safety of the public.  Moreover, prisons have no advance warning of what items will be arriving in or sent through the mail.  There would thus appear to be no practical way to provide pre-deprivation remedies for prisoners in this context and Scott has not suggested any method to the court.

21

Scott concedes that a post-deprivation process exists and that he has utilized it. *See* Compl. ¶ 17.  Moreover, he alleges no facts to suggest that this process is inadequate, stating only that "[a]dministrative review was sought to no avail."  Second Am. Compl. ¶ 17(B)(k); *see also id.* ¶ 17(B)(m).  However, "[t]he adequacy of a postdeprivation remedy does not turn on the plaintiff's satisfaction with the outcome."  *Jones v. Burton*, 173 F. App'x 520, 522 (7th Cir. 2006) (citing *Easter House v. Felder*, 910 F.2d 1387, 1406 (7th Cir.1990) (en banc)).

Thus, Scott has not shown that a clearly established due process right could have been violated by the defendants' actions.  Scott and Conley thus have qualified immunity from suit and the *Bivens* claims against them will be dismissed.

## IV.   PRIVACY ACT CLAIMS

Scott lodges claims under various sections of the Privacy Act including §§ 552a(e)(1) (maintenance of only "relevant and necessary" information), (e)(7) (restrictions on records describing First Amendment activities), (b) (restrictions on unauthorized disclosures), and, by implication, (d) (access to records) and (c)(3) (accounting of disclosures).  Defendants moves to dismiss all of these claims.  Defs.' Third MTD 1.

In considering defendants' prior motion to dismiss, the Court refused to resolve arguments regarding Scott's Privacy Act claims.  Defendants had contended that the relevant system of records was exempt from the Privacy Act provisions under which Scott sought relief. *See* Defs.' Second Mem. 38.  The Court noted that "without a clear understanding of the 'system of records' at issue, the Court cannot determine whether the system is exempt from any provisions of the Privacy Act."  As discussed in more detail below, defendants still have not provided sufficient information from which the Court can determine whether Scott's claims relate to only one system of records and whether that system is exempt from relevant Privacy Act

provisions.   Nevertheless, the Court finds that Scott's Privacy Act claims merit dismissal on other grounds.

### A.        Legal Standard Generally

The Privacy Act places certain requirements on federal agencies maintaining "system[s] of records . . . from which information is retrieved by the name of the individual . . . ." 5 U.S.C. § 552a(a)(5).   For example, the Act limits disclosure without an individual's consent, *id.* § 552a(b), requires agencies to keep an accurate accounting of certain disclosures and to make such accounting available to an individual upon request, *id.* § 552a(c), provides for individual access to and modification of records, *id.* § 552a(d), and sets forth additional rules for agency maintenance of records, *id.* § 552a(e).

The Privacy Act explicitly provides for judicial review.   Because the Court discusses these provisions in some detail, the relevant subsections are reprinted below:

> (g)(1) Civil remedies.--Whenever any agency
>
> > (A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request . . . ;
> >
> > (B) refuses to comply with an individual request [for access to records] under subsection (d)(1)
> >
> > (C) fails to maintain any record concerning an individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the rights . . . or benefits to the individual that may be made on the basis of such record . . . ; or
> >
> > (D) fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual
>
> the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.
>
> (2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record . . . .
>
> (3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant . . . .

(4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of--

> (A) actual damages . . . ; and

> (B) the costs of the action together with reasonable attorney fees . . . .

5 U.S.C. § 552a(g).

As the statute notes, courts may enjoin the agency from withholding records and order production and amendment of records. *Id.* §§ 552a(g)(2)(A)–(B), 552a(g)(3)(A)–(B). They may assess reasonable attorney fees and costs against the United States. *Id.* Actual damages are available in suits for failure to maintain accurate records or failure to comply with other provisions of the law if the agency acted intentionally or willfully. *Id.* § 552a(g)(4)(A)–(B).

The head of agencies that principally enforce criminal laws, including correctional agencies, may exempt systems of records from Privacy Act provisions, including provisions related to access, copying, amendment, and accuracy of records. *Id.* § 552a(j). Federal regulations currently exempt BOP's Inmate Central Record System (ICRS) from certain Privacy Act provisions, specifically those related to access to and amendment of records, *id.* § 552a(d), collection of information directly from individuals, *id.* § 552a(e)(2), civil remedies, *id.* § 552a(g), and accuracy, *id.* § 552a(e)(5). *See* 28 C.F.R. § 16.97. Inmates may instead contest the accuracy and content of such records administratively. 28 C.F.R. §§ 16.9, 16.45.

**B.      Claims Under 5 U.S.C. § 552a(e)(1): "Relevant and Necessary" Information**

Scott alleges that BOP violated the Privacy Act's requirement that an agency "maintain . . . only such information about an individual as is *relevant and necessary* to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President . . . ." 5 U.S.C. § 552a(e)(1) (emphasis added). Scott's claim stems from his assertion that, while in the CMU, his phone conversations were recorded and that these and electronic

24

copies of his social mail will be retained indefinitely by BOP, including beyond his release from prison. Compl. ¶¶ 8–9. He states that these files form a "system of records" separate from any system of records exempt from Privacy Act requirements and that there is "no valid and legitimate penalogical [sic] reason for [BOP] to maintain copies" of these communications after his release to the community. *Id.* ¶ 9–10. Scott appears to seek only injunctive relief as to this claim. *See* Am. Compl. ¶ 32(A) ("Plaintiff specifically seeks injunctive relief that would enjoin [BOP] from maintaining in any form . . . any records collected by its CTU . . . after the termination of his period of incarceration . . . ."); Compl. ¶ 32 (seeking damages only from named individual defendants sued in their individual capacities in *Bivens* claims and not appearing to seek damages from BOP).

BOP responds that "the [CMU's] records are maintained in an authorized system of records that is exempt from the Privacy Act." Defs.' Mem. P. & A. in Support of Defs.' MTD and Opp'n to Pl.'s Mot. for Recons. 2, ECF No. 83 [hereinafter Defs.' Third Mem.]. BOP does little more to argue for dismissal of this particular claim, focusing its efforts on Scott's other Privacy Act claims.

The Court finds that dismissal of this claim is warranted. It is unclear if Scott brings his suit under the civil remedy provisions of 5 U.S.C. § 552a(g)(1)(C) for failure "to maintain any record . . . with such . . . relevance . . . as is necessary to assure fairness . . ." or under (g)(1)(D) for failure to "comply with any other provision or this section." Regardless, under either section he must show that BOP's alleged violation caused him some adverse effect. *See* 5 U.S.C. § 552a(g)(1)(C) (providing for civil remedy when an agency "fails to maintain any record concerning any individual with such . . . relevance . . . as is necessary to assure fairness . . . and consequently *a determination is made which is adverse to the individual*" (emphasis added)); *id.*

§ 552a(g)(1)(D) (providing for civil remedy where agency's failure to comply with the Act *had* "*an adverse effect* on an individual" (emphasis added)).  Scott has not alleged facts to show that he has suffered or is suffering any adverse determination or effect because of BOP's alleged failure to comply with the requirement that it collect only "relevant and necessary" information. Scott only makes the conclusory statement that BOP has "utilized those records in a manner that causes and continues to cause an adverse effect on plaintiff." Compl. ¶ 28.[9]

Moreover, it appears that Scott may not seek injunctive relief for a violation of § 552a(e)(1) brought under the civil remedy provisions of § 552a(g)(1)(C), 552a(g)(1)(D).  The D.C. Circuit has previously stated that the Privacy Act's "subsection on civil remedies authorizes entry of injunctive relief in *only two specific situations*," *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988).[10]  The Circuit has also noted that a "number of [its] sister circuits have held that injunctive remedies are available only for an agency's wrongful withholding of records under (g)(3)(A) [and by extension (g)(1)(B)] and an agency's wrongful refusal to amend records under § (g)(2)(A) [and by extension § 552a(g)(1)(A)] . . . .  *See Haase v. Sessions*, 893 F.2d 370,

---

[9] It also appears that Scott may have failed to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997 et seq, and in suits for injunctive relief under the Privacy Act.  *See Jones v. Bock*, 549 U.S. 199, 211 (2007) ("[E]xhaustion is mandatory under the PLRA . . . ."); *Nagel v. U.S. Dep't. of Health, Educ. & Welfare*, 725 F.2d 1438, 1440–41 (D.C. Cir. 1984) (applying exhaustion requirement in context of suit apparently filed under § 552a(g)(1)(A)); *Phillips v. Widnall*, 110 F.3d 74 (10th Cir. 1997) ("The Privacy Act authorizes four civil remedies . . . .  A plaintiff must exhaust administrative remedies before asking a court to compel correction of an inaccurate record, but not when seeking damages."); *cf. Leighton v. CIA*, 412 F. Supp. 2d 30, 35 (D.D.C. 2006) (requiring exhaustion in suit for injunctive relief).  Nevertheless, exhaustion under the PLRA is an affirmative defense which the defendant bears the burden of pleading and proving. *Bock*, 549 U.S. at 216.  It is unclear if exhaustion under the Privacy Act is an affirmative defense though "courts typically regard exhaustion as an affirmative defense . . . ." *Id.* at 212; *see also Ramstack v. Dep't of Army*, 607 F. Supp. 2d 94, 104 (D.D.C. 2009) (considering exhaustion to be an affirmative defense in the context of Privacy Act claims).  Since BOP has not raised this as a defense to Scott's Privacy Act claims, the Court will not consider the issue here.

[10] As the two sections for which injunctive relief is available, the *Doe* Court cited § 552a(g)(2)(A) (authorizing courts to order agencies to *amend* individuals' records in suits brought under subsection (g)(1)(A)) and § 552a(g)(2)(B) (authorizing entry of reasonable attorney's fees for cases brought under subsection g(1)(A)).  The court did not mention § 552a(g)(3)(A) which provides that, in suits brought under § 552a(g)(1)(B) for unlawful withholding of records, a district court may "enjoin the agency from withholding the records and order the production . . . of any agency records improperly withheld . . . ."  This is presumably because *Doe* did not deal with a refusal to provide the plaintiff with access to his records, as addressed in subsections (g)(1)(B) and (g)(3)(A).

374 n.6 (D.C. Cir. 1990).  Based on the foregoing, our circuit precedent suggests that injunctive relief is not available for suits alleging violations of § 552a(e)(1) brought under either § 552a(g)(1)(C) or (g)(1)(D).  The Department of Justice similarly interprets these provisions:

> The Privacy Act provides for four separate and distinct civil causes of action, *see* 5 U.S.C. § 552a(g), two of which provide for injunctive relief – amendment lawsuits under (g)(1)(A) and access lawsuits under (g)(1)(B) – and two of which provide for compensatory relief in the form of monetary damages – damages lawsuits under (g)(1)(C) and (g)(1)(D).

U.S. Dep't of Justice, Overview of the Privacy Act of 1974 (2012 ed.), *available at* http://www.justice.gov/opcl/1974privacyact-overview.htm.

Thus, Scott cannot seek injunctive relief for this claim.  Even if he were to seek damages, based on a purported violation of § 552a(e)(1), he has not alleged sufficient facts to support such a claim.  To state a claim for damages, Scott must state facts that plausibly suggest that BOP unlawfully disclosed information "in a manner which was *intentional or willful* . . . ."  5 U.S.C. § 552a(g)(4) (emphasis added); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The terms intentional and willful "do not have their vernacular meanings; instead, they are terms of art . . . interpreted . . . to set a standard that is 'somewhat greater than gross negligence.'"  *White v. Office of Pers. Mgmt.*, 840 F.2d 85, 87–88 (D.C. Cir. 1988) (quoting *Hill,* 795 F.2d at 1070).  Liability results "'only when the agency . . . commit[s] the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.'"  *Id.* (quoting *Albright v. United States,* 732 F.2d 181, 189 (D.C. Cir. 1984)).  An agency is not "strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions."  ."  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citation and internal quotation marks omitted).  Mere negligence does not suffice; "something more than gross negligence is required."  *Andrews v. Veterans Admin.*, 838 F.2d 418, 424 (10th Cir. 1988) (citations omitted).

Nothing in Scott's complaints suggests that BOP acted without grounds for believing its action to be lawful or that it flagrantly disregarded his rights under the Privacy Act. Where "this element of a Privacy Act damages claim was lacking in the complaint," district courts may properly dismiss the complaint for failure to state a claim under 5 U.S.C. § 552a(g)(4)." *White*, 840 F.2d at 87–88. He has also given no indication that he will be able to show that he sustained any "actual damages" as a result of BOP's alleged retention of records in violation of 552a(e)(1) and as required by 5 U.S.C. § 552a(g)(4)(A).

This claim is dismissed based on Scott's failure to allege that he suffered an adverse determination or effect as required under § 552a(g)(1)(C) or (g)(1)(D). Even if he could show such a determination or effect, it appears that he could not seek injunctive relief for this claim and would have to meet the requirements for monetary damage claims by showing that BOP violated the Act in a manner that was "intentional and willful." He has not done so and this claim is dismissed.

### C.      Claims Under 5 U.S.C. § 552a(e)(7): Records Describing First Amendment Exercise

Scott also argues that the records system described above violates 5 U.S.C. § 552a(e)(7) because it describes his exercise of First Amendment rights. Section 552a(e)(7) provides that an agency maintaining a system of records shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless . . . pertinent to and within the scope of an authorized law enforcement activity." "To claim a violation of § 552a(e)(7) . . . [a plaintiff] must allege that the [agency] maintained records of how he exercised his First Amendment rights and that these records were not within the scope of a law enforcement activity." *Elnashar v. U.S. Dep't. of Justice*, 446 F.3d 792, 795 (8th Cir. 2006).

Again, Scott appears to seek only injunctive relief as to this claim, requesting only that BOP be enjoined from maintaining these records after his incarceration. *See* Am. Compl. ¶ 32A. He appears to rely on the civil remedy provision of § 552a(g)(1)(D). To state a claim under § 552a(g)(1)(D), a plaintiff must allege that the agency violated the Privacy Act "in such a way as to have an adverse effect on an individual . . . ." 5 U.S.C. § 552a(g)(1)(D); *see also Bassiouni v. FBI*, 436 F.3d 712, 723 (7th Cir. 2006) (holding that plaintiffs must plead that agency's violation of § 552a(e)(7) had "an adverse effect" and noting that this is consistent with "Congress' dual concerns of protecting First Amendment rights and protecting national security").

BOP does not dispute that the records describe Scott's First Amendment activities. However, it argues that BOP maintains these records pursuant to a valid law enforcement reason and that Scott has not alleged "actual damages," as required for a request for damages.

BOP argues that the CMUs and associated monitoring of inmates' communications with persons in the community is designed to "protect the safety, security, and orderly operation of Bureau facilities, and protect the public." Defs.' Third Mem., Ex. A (Decl. of Leslie Smith) ¶ 6, ECF No. 83-1 [hereinafter Smith II Decl.]. "CTU staff will determine whether intelligence worthy data has been identified through monitoring and will ensure the records are maintained for an indeterminate period of time." *Id.* ¶ 5. Records of phone calls and copies of emails are retained for 180 days "unless found to be intelligence worthy." *Id.* ¶ 5 n.1.

Scott conclusorily alleges that BOP's monitoring of his First Amendment activities and maintenance of related records serves "no valid and legitimate penalogical [sic] reason . . . after [his] release to the community." Compl. ¶ 10. However, Scott never alleges that BOP lacked a valid law enforcement purpose in maintaining this information in the first place. *See id.*; *see also* Pl.'s Reply to Defs.' Third MTD 1–2, ECF No. 89 ("[T]he continuing maintenance, post-release,

of recordings of plaintiff's phone calls, and copies of his emails and . . . mail he sent or received while confined in the CMU serve no law enforcement purpose . . . ."). However, the passage of time does not cause records to lose their relevance to law enforcement activity. "Information that was pertinent to an authorized law enforcement activity when collected does not later lose its pertinence to that activity simply because the information is not of current interest (let alone 'necessity') to the agency." *J. Roderick MacArthur Found. v. FBI,* 102 F.3d 600, 603 (D.C. Cir. 1996), *cert. denied sub nom. Lindblom v. FBI,* 522 U.S. 913 (1997). Scott has failed to allege that the records at issue were not relevant to a law enforcement purpose when collected. The mere allegation that the BOP maintains these records after Scott's release does not state a claim under the Privacy Act.

Moreover, to the extent that Scott must allege he suffered an "adverse effect" from maintenance of these records, he has not done so.[11]

With respect to BOP's argument that Scott must allege "actual damages," the Court does not read Scott's Complaint to request damages for this claim. Unlike claims for violations of § 552a(e)(1) brought under 552a(g)(1)(C) or (g)(1)(D), the D.C. Circuit has expressly considered the possibility that injunctive relief may be available for violations of the First Amendment provisions of (e)(7), stating:

> It is not at all clear to us that Congress intended to preclude broad equitable relief (injunctions) to prevent (e)(7) violations . . . . And in the absence of such an explicit intention, by creating a general cause of action (under (g)(1)(D)) for violations of the Privacy Act, Congress presumably intended the district court to use its inherent equitable powers—at least to remedy violations of (e)(7).

*Haase,* 893 F.2d at 374 n.6. Although the Circuit did not explicitly decide the question in *Haase,* its language suggests that injunctive relief for (e)(7) violations under (g)(1)(D) *would* be

---

[11] Exhaustion of administrative remedies is not required for alleged violations of § 552a(e)(7). *Nagel,* 725 F.2d at 1441. Even if it were, BOP has not raised this defense.

available.  Thus, the Court will not find, as it did for Scott's (e)(1) claim, that Scott may not seek injunctive relief for his (e)(7) claim.

Nevertheless, his claim will be dismissed without prejudice because he has not alleged facts to suggest that BOP's system of records lacked a law enforcement purpose or that he has suffered any adverse effect as a result of BOP's alleged violation.

### D.    Plaintiff's Claim Under 5 U.S.C. § 552a(b): Unauthorized Disclosure

Next, Scott alleges that BOP has released information about himself, without his consent, to persons not authorized to receive such disclosures in violation of § 552a(b).  *See* Compl. ¶¶ 28, 30.  Scott seems to seek only damages for this claim.  BOP has already engaged in the allegedly unlawful conduct and Scott gives no indication of a continuing violation for which injunctive relief would be appropriate.  In any case, our Circuit has suggested that plaintiffs may seek only damages, not equitable relief, for violations of § 552a(b) under the civil remedy provisions of § 552a(g)(1)(D).  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (noting that *Doe v. Stephens* had held that "only monetary damages . . . are available to § 552a(g)(1)(D) plaintiffs" and that "[a]s *Doe*, like [*Sussman*], concerned remedies under . . . § 552a(g)(1)(D) for violations of § 552a(b)," the court "treat[ed] it as controlling").

The Privacy Act prohibits an agency from "disclos[ing] any record which is contained in a system of records . . . to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(b).[12]

---

[12] There are twelve exceptions to this "no disclosure without consent" rule, 5 U.S.C. § 552a(b)(1–12), only one of which may be relevant to this discussion.  Disclosure can occur "for a routine use," *id.* § 552a(b)(3), and that term means, "the use of such record for a purpose which is compatible with the purpose for which it was collected."  *Id.* § 552a(a)(7).  Each routine use of the records must be published in the Federal Register.  *Id.* § 552a(b)(3), (e)(4)(D). The BOP appears to have relied on the routine use exception, *see* Defs.' Reply, Smith I Decl. ¶ 14, but the published notice on which the BOP relied, *see id.* (citing 67 Fed. Reg. 9321 (Feb. 28, 2002)), does not list disclosure of information to creditors.  Furthermore, the notice pertains to the Office of Internal Affairs Investigative Records (JUSTICE/BOP-012), and it is not clear that the relevant records are maintained in this system.

According to Scott, BOP has "given unsolicited notice and information to certain of plaintiff's creditors that plaintiff is incarcerated[,] and as a direct result of that unsolicited notice and information[,] plaintiff's long-standing account(s) were closed," causing "an adverse and derogatory effect on plaintiff's credit scores." *Id.* ¶ 32.

BOP's arguments regarding the legality of its actions are somewhat unclear.  For example, BOP suggests there is rarely a violation of the Privacy Act where an official's knowledge of disclosed information comes from a source other than a system of records under the Privacy Act.  Defs.' Third Mem. 13.  However, BOP never states that the source of the information was other than protected records.  Similarly, BOP implies that its disclosure cannot amount to a Privacy Act violation because the information released was public.  *See* Defs.' Third Mem. 13 ("'[N]o reasonable jury . . . could find a violation of the Privacy Act arising from the alleged disclosure of the plaintiff's conviction [that] is a matter of public record.'" (citation omitted)).  Again, however, BOP does not directly state that it released only public information and in fact implies that its release encompassed non-public information as well.  *Id.* at 15 ("The only issue is whether the BOP appropriate released information *gathered through intelligence* about the possibly illicit activities of the Plaintiff." (emphasis added)).  It is also not self-evident that a release of individually-identifiable information, even if technically available to the public, automatically satisfies the requirements of the Privacy Act.  Nevertheless, because Scott appears to focus on the unsolicited nature of the disclosures, rather than the disclosure itself, the Court need not decide that particular issue.  *See* Pl.'s Opp'n to Defs.' First MTD 28, ECF No. 25 ("Plaintiff takes no issue with the fact that the BOP may properly release . . . what they define as 'public' information . . . but that release must be upon a specific request.").

BOP also seems to argue that its release was permissible because the Prison Security and Intelligence Record System (PSIRS) (JUSTICE/BOP-001) is exempt from Privacy Act provisions allowing for civil remedies. *Id.* at 14, 38 (citing 67 Fed. Reg. 117, 41449–41450). Thus, BOP implies, but does not directly state, that the information released was maintained in the PSIRS. *Id.* at 15. There are a number of problems with this argument. Pursuant to § 552a(j)(2), BOP's Director may promulgate regulations to exempt a system of records from certain sections of the Privacy Act if that system consists of "reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision." BOP previously exempted its Custodial and Security Record System (CSRS) from numerous sections of the Privacy Act, including §§ 552a(c)(3) (accounting of disclosures), (d) (access to records), and (g) (civil remedies). *See* 28 C.F.R. § 16.97(a)(1). BOP argues that it "modified and expanded" the CSRS and renamed it the Prison Security and Intelligence Record System (PSIRS). Defs.' Second Mem. 38; *see also* 67 Fed. Reg. 117, 41449–41450. Thus, BOP contends, the "amended system of records [now called PSIRS]. . . is exempted from the Privacy Act." Defs.' Second Mem. 38.

However, BOP provides no support for its contention that a "modified and expanded" system of records remains exempt from Privacy Act requirements without complying anew with § 552a(j)(2). Moreover, the Federal Register notice announcing the modification and expansion of the records system was issued in June 18, 2002 and was to be effective sixty days from the date of publication. BOP does not state that the notice actually went into effect. More importantly, Scott alleges that BOP did not begin to implement its CMU policies and associated collection of information until 2006. Thus, it is not obvious that records collected pursuant to these policies were included in the PSIRS as it was described in the Federal Register.

Even assuming the PSIRS is exempt from Privacy Act provisions under 28 C.F.R. § 16.97(a)(1) and 67 Fed. Reg. 41449, those regulations do not exempt the PSIRS from Privacy Act *disclosure* provisions at 5 U.S.C. § 552a(b).  Although they exempt the system from the civil remedy section of the Privacy Act, § 552a(g), the regulation goes on to state that this is because "exemption from provisions of *subsection (d)* [providing for access to and amendment of records] will render provisions of [the civil remedy subsection] inapplicable."  28 C.F.R. § 16.97(b)(9) (emphasis added).  However, the Privacy Act's civil remedy section also allows for civil suits based on a failure "to comply with *any other provision*" of the Act.  § 552a(g)(1)(D) (emphasis added).  Thus, even if the regulations exempt the PSIRS from certain Privacy Act provisions, it is not clear that they exempt the system from causes of action based on unauthorized *disclosures* rather than a *refusal to provide access* to *or amendment* of records.

Scott's claim nevertheless fails.  Again, to state a claim for damages, Scott must state facts to plausibly suggest that the BOP acted intentionally or willfully, which means something more than gross negligence.  An agency is not "strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions."  *Laningham*, 813 F.2d at 1242 (citation and internal quotation marks omitted).

Nothing in Scott's complaints suggests that BOP acted without grounds for believing its action to be lawful or that it flagrantly disregarded his rights under the Privacy Act.  Where "this element of a Privacy Act damages claim was lacking in the complaint," the district court may dismiss the complaint for failure to state a claim under.  *White*, 840 F.2d at 87–88.

BOP previously explained that it disclosed Scott's status as a federal inmate to credit card companies because it believed he was using family and friends to open and manage financial accounts and to "make it appear as though credit card purchases were being made without [his]

34

knowledge or consent."   Smith I Decl. ¶ 12.   BOP believed that Scott had correspondence

"mailed to individuals in the community . . . to avoid being identified by financial institutions as

an inmate who was incarcerated."   Smith I Decl. ¶¶ 12–14.   BOP previously justified its actions

as "[p]ursuant to the CMU's enabling regulation and [BOP] routine use, 67 Fed. Reg. 9321" and

as "an attempt to prevent further financial losses to these credit card companies, prevent further

criminal activities, and in line with the mission of the CMU, which is the protection of the

public."   *Id.*   The most recent Declaration submitted by BOP states that

> It was concerning that inmate Scott had participated in a scheme to commit fraud
> while serving a sentence in federal prison. . . .   Inmate Scott was found to be using
> addresses in the community and concealing his status as an inmate from the credit
> card companies.   This release was done . . . to prevent . . . crimes of fraud against
> these credit card companies and [to] protect the public.

Smith II, Decl. ¶ 7.

In short, Scott has failed to allege facts to suggest that BOP disclosed information in

violation of the Privacy Act in a manner that was intentional or willful.   Accordingly, this claim

will be dismissed without prejudice.

### E.      Plaintiff's "Refus[al] to Disclose" Claim

Scott alleges that the BOP has "refused to disclose to plaintiff material (4 folders of

records as of September 30, 2009) collected on or pertaining to plaintiff by [BOP]."   Am. Compl.

¶ 28(A).   He does not provide the Court with any detail regarding the basis for this allegation, the

legal authority under which he seeks relief, or whether he seeks injunctive or monetary relief.   In

fact, the language above seems to be the only information in Scott's three complaints regarding

this claim.   Based on other pleadings, the Court assumes that this claim is based on a single

Privacy Act request by Scott.   Defs.' Second Mem. 37.   However, that request is not in the

record.

The Court's analysis of this claim will turn on the information and remedies sought and the provisions which Scott alleges that BOP violated.  Scott has simply not stated enough facts in his complaints to make out a claim that BOP has unlawfully refused to disclose materials collected about him.  The Court thus dismisses this claim without prejudice.  Scott may amend his complaint to state a claim.

## V.    CONCLUSION

Although the Court grants Scott's motion for reconsideration as to his *Bivens* claims, these claims nevertheless fail.  The Court lacks personal jurisdiction over defendants Lockett, Jett, Cozza-Rhodes, and Schultz and the claims against these defendants will be dismissed without prejudice.  The claims against the "John Doe" defendants will also be dismissed as Scott has failed to identify these defendants after an opportunity for discovery.  Although he could renew his motion to substitute David Schiavone for one John Doe defendant, such a motion would fail given that the Court finds that the remaining defendants have qualified immunity from suit and that the claims against them should be dismissed.  Finally, Scott's Privacy Act claims fail for the reasons outlined above.

An Order consistent with this Memorandum Opinion issued on March 28, 2013.  ECF No. 93.

Signed by Royce C. Lamberth, Chief Judge, on April 9, 2013.